


IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

**Sara M. Woggerman,**

Plaintiff,

v.

**Portfolio Recovery Associates, Inc.**

Defendant.

Case No. 2:12cv186

**COMPLAINT FOR DAMAGES**
**(Jury Trial Demanded).**

Sara Woggerman ("Plaintiff" or "Woggerman"), through counsel, brings this civil action against Defendant Portfolio Recovery Associates, Inc. ("PRA" or "Company") for its unlawful employment actions against Woggerman in violation of Title VII. In support thereof, Woggerman alleges as follows:

## INTRODUCTION

1. Sara Woggerman was a rising star at Portfolio Recovery Associates. She was hired in January 2007, and almost immediately began advancing through the Company. However, her rise came to an abrupt halt when in February 2010 she was sexually pursued and assaulted by a Company vice president while accompanying him on a business trip. Woggerman managed to halt the Vice President's attack and filed a sexual harassment Complaint with the Company upon returning from the business trip.

2. The Company's response to Woggerman's sexual harassment complaint was swift and corrective. Unfortunately, despite the fact that the Vice President admitted to his illegal

conduct, the corrective action taken was against Woggerman, not her harasser. First, the Vice President of Human Resources ("VP of HR"), in a successful intimidation tactic, falsely accused Woggerman of committing two crimes, including "filing a false complaint." Second, the VP of HR advised Woggerman to withdraw her Complaint and provided her less than 24 hours to do so. Third, after Woggerman refused to withdraw the Complaint, the VP of HR issued Woggerman a final written warning for "filing [the sexual harassment complaint] in bad faith (for personal gain)," even though Woggerman's harasser had admitted to the harassment.

3. At the time of the sexual harassment complaint, Woggerman was in-line for a substantial promotion – a significant advancement in her career which would have enabled her to relocate to the Company's corporate office in Norfolk, Virginia. The issuance of the final written warning, however, rendered Woggerman ineligible for the promotion, and it deprived her of a five-percent merit raise for which she had already qualified. After being advised by a management colleague that her sexual harassment Complaint ruined her career at the Company, Woggerman resigned from her position. She brings this suit to remedy the Company's unlawful actions.

**Parties**

4. Sara Woggerman is an engaging 32 year old, former employee of PRA. She worked for the Company from January 2007 until May 2011. At the time of her resignation, Woggerman worked as an Agency Performance Manager & Attorney Auditor in the Company's Birmingham, Alabama office. Throughout her employment with PRA, she received the highest marks on all of her performance reviews and never received an oral or written warning until she filed a sexual harassment complaint against a company vice president. She currently resides with her family in Rochester Hills, Michigan.

5. Portfolio Recovery Associates, Inc. is an international debt-purchasing company doing business in Virginia with its corporate office located in Norfolk, Virginia. Since it opened its doors in 1996, the Company's exponential growth has been well-documented and praised in both local and national publications.

**Jurisdiction and Venue**

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this case presents a federal question under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000, *et. seq*. On January 18, 2012, Woggerman requested and received a right-to-sue letter from the Equal Employment Opportunity Commission.

7. Venue is proper within this District under 42 U.S.C. § 2000e-5(f)(3), as a substantial part of the Company's unlawful employment practices took place in its corporate office in Norfolk, Virginia.

**FACTUAL ALLEGATIONS**

8. Sara Woggerman was an Agency Performance Manager & Attorney Auditor working in PRA's Birmingham, Alabama office. As part of her regular duties, she worked with the Company's Vice President of Collections, Justin Miller, on various projects spearheaded by Miller.

9. Miller was two levels above Woggerman in seniority. Although not directly in Woggerman's chain of command, Miller had authority to undertake or recommend tangible employment decisions affecting Woggerman's employment. Miller also had authority to direct Woggerman's activities on projects on which they worked together. Upon information and belief, Miller has a history of reported incidents of sexual harassment in his tenure with PRA.

**10.** In February 2010, Woggerman, Miller, and a team of PRA employees went on a business trip to Las Vegas. Although various employees attended the trip for different purposes, Woggerman was specifically asked to attend the business trip to assist Miller in checking on a Company project overseeing a reorganization of PRA's Las Vegas subsidiary. Miller and Woggerman had been working on the project together since December 2009.

**11.** Miller sexually assaulted Woggerman on the first evening of the business trip. While the pair was walking next to each other at the Luxor Hotel, Miller grabbed Woggerman by her arm, pulled her into a hallway, pushed her up against a wall, and began forcibly kissing her. Woggerman objected vigorously to the assault, and after several very long seconds was able to push Miller aside and escape from his grasp.

**12.** After the initial assault, Woggerman returned to the table to regain her composure, the same table where she and Miller had previously been discussing the reorganization project minutes before. Miller returned to the table undeterred. Despite Woggerman's forceful objection, Miller made further sexual advances toward Woggerman during that evening. These included Miller grabbing Woggerman's buttocks, touching her upper leg on several occasions, and touching Woggerman between her thighs. Woggerman rejected each of Miller's advances and repeatedly asked him to stop his inappropriate behavior.

**13.** The following day, Woggerman reported the incident to her direct supervisor, Melissa Massey, who also attended the PRA business trip. Woggerman was hesitant to formally complain about Miller's conduct because she was aware of several employees who faced retaliation from the Company for complaining about protected activity.

**14.** Nevertheless, on February 14, 2010, upon her return from the PRA business trip, Woggerman met with Massey to discuss Miller's harassment in detail. With Woggerman's

permission, Massey reported Miller's conduct to Woggerman's second-level supervisor. Woggerman received a voicemail later that afternoon from Donna Runyan, Vice President of Human Resources, asking Woggerman to call Runyan's cell phone to discuss Miller's conduct. Woggerman returned Runyan's call later that day. However, because she would be providing a verbal statement, Woggerman had her husband witness the conversation.

**15.** During the initial phone call, the VP of HR advised Woggerman that the Company normally does not consider itself responsible for harassment that occurs off Company property, but that she was investigating the Complaint in this particular instance because "the reality is that you [and Miller] were out there for the Company."

**16.** On February 16, 2010, the VP of HR sent Woggerman an email requesting a second phone conference to discuss "some follow-up questions." The VP began the phone conference by asking:

> ***Is anyone listening to this conversation?*** [No.] ***Was anyone listening to our call the other day?*** [Yes, my husband.] ***Are you aware that that is illegal?***

It is not "illegal" to have one's spouse witness a phone call to human resources, which Woggerman at the time did not know. Woggerman immediately felt intimidated and replied that she was not aware it was illegal for her husband to witness the phone call. The VP then discussed the information she had discovered in the course of her investigation, which included her saying that Miller had admitted to the sexual assault.

**17.** However, within five minutes of disclosing Miller's admission, The VP issued Woggerman another veiled threat:

> ***I am going to give you an opportunity to drop your Complaint [against Miller] because filing a false Complaint is a serious crime.***

It is not a "serious crime" to file a false complaint to human resources, which Woggerman at the time did not know. Confronted with the reality that she had been accused by the Vice President of Human Resources of committing two crimes in the course of filing her sexual harassment complaint, Woggerman became exceedingly nervous that she would face disciplinary action, and possibly prosecution, for engaging in alleged criminal activity. Woggerman defended herself against the "false complaint" accusation by reminding the VP of HR that she previously stated that Miller had admitted to the sexual harassment. When faced with her contradicting statements, the VP corrected her "false complaint" allegation and stated that she was not questioning whether the sexual harassment actually occurred, only Woggerman's motivation for bringing the complaint. Woggerman replied that she had not lied about Miller's sexual harassment and therefore would not drop the Complaint. The VP admonished Woggerman, saying she was "highly disappointed in [Woggerman] for dragging [her] into to this" and for "wasting [her] time." The VP of HR concluded the phone conference by giving Woggerman until the following day to withdraw her Complaint and implied that she would face disciplinary action if she did not do so. The VP did not explain why PRA believed that Woggerman filed her sexual harassment Complaint with questionable motives.

**18.** The following day, the VP of HR emailed Woggerman advising her that she would be receiving a final written warning. That night, a management-level employee at PRA

called Woggerman to warn her that her sexual harassment complaint would "drastically affect [her] future" at the Company.

**19.** Woggerman did not withdraw her sexual harassment complaint. On February 18, 2012, the VP of HR issued Woggerman a final written warning for "fil[ing] a complaint . . . [against Vice President of Collections, Justin Miller] in bad faith (for personal gain)." Justin Miller was not in Woggerman's chain of command. The Company did not explain how Woggerman stood to personally benefit from her sexual harassment complaint. Several steps of PRA's progressive disciplinary policy were skipped in order to issue the final written warning.

**20.** After the final written warning was issued, Woggerman received a second call from the same management-level employee who advised her that she would not be able to advance in the Company due to her sexual harassment complaint.

**21.** The February 18 final written warning contained misleading statements designed to minimize Miller's illegal conduct and delegitimize Woggerman's motivation for filing the Complaint. On March 10, 2012, Woggerman emailed the VP of HR to highlight these misrepresentations:

> Good Morning Donna:
>
> I just re-read my Final C&C and wanted to clarify a couple of the items stated. I have to be honest, at the time this was delivered, I didn't fully read through the form[,] and I really just wanted to have the matter closed. I've never been in this situation before, at any job, so I just took it at face value. Since then, a couple of things have been bugging me, which made me re-evaluate the document."

Woggerman listed two corrections to the final written warning:

> 1. Your first statement states "Ms. Woggerman reported a complaint to Donna Runyan, VP Human Resources, that she was subjected to inappropriate conduct by a Company VP . . ."

a. ***I just want to make sure it is clear that Justin Miller's actions were not only inappropriate and unsolicited, it was sexual in nature. I also repeatedly asked him to stop.***

2. The second paragraph states that I said I would not be filing the complaint if my husband was not forcing me to do so.

   a. I recall stating that if the events hadn't transpired the way that they did, I would not be talking to you. But, I want to be clear, I wasn't forced to do anything. . . . [M]y reasoning for not filing a complaint sooner are [sic] different than what you suggest in the write-up. I simply believe, from being in the corporate environment and working hand-in-hand with Human Resources through many positions[,] that ***people who report complaints such as this usually get it turned back around on them instead of being protected. This belief is the true reason I hesitated to file a complaint.***

(emphasis added). The VP of HR did not reply to Woggerman's email.

**22.** At the time Woggerman issued her sexual harassment complaint, she was in-line for a significant promotion to work in the Company's corporate office. Although the Company had planned to go through the motions of accepting applications and conducting interviews, Woggerman had been told that the position was for her, as the Company desired to have her relocated to the corporate office where she could continue her promising future at PRA. Woggerman was scheduled to "interview" for the position on February 23, 2010. However, the final written warning automatically rendered her ineligible for the position, and her interview was cancelled.

**23.** In addition, Woggerman was entitled to a five-percent raise under PRA's merit raise program due to the exceptional evaluation she had received in January 2010. However, the final written warning deprived her of the five-percent merit raise for which she had previously qualified.

**24.** Faced with the reality that her formerly promising career at PRA was ruined and that the Company she so diligently served had turned its back on her, Woggerman noticed her resignation by letter on May 6, 2011:

> I brought forth a complaint regarding an aggressive sexual advance by VP, Justin Miller[,] and it not only was obviously disregarded, I was made to feel embarrassed and ashamed to have, as [VP of HR] Donna Runyan put it, 'wasted her time'. I was also repeatedly asked to retract my statement and the attempt was made to intimidate me into doing so. When I did not retract my statement, I was falsely told that it was illegal to have had my husband listen in on the complaint when I verbally gave it to Donna Runyan. ***She also excluded Justin Miller's name from any written communication and made sure that everything was done verbally.*** After a perfect employment history with PRA and nothing but exceptional reviews[,] I was immediately moved to a final Coaching and Counseling after Donna deemed my complaint as brought forward in 'bad faith'. This insured that I was unable to apply for any promotions that had been discussed with upper management on several occasions prior to filing my complaint. This also affected my raise, which was on January 4, 2011[,] even though the Final C&C was not until mid-February. . . . I was very hesitant to bring forward the complaint because I have little faith in the Human Resources department[,] but I honestly hoped that my track record of being an honest and loyal employee would stand for something. ***I'm saddened by the apathetic PRA response to a sexual assault by a VP of the company, especially a VP that, as I and others know, has a track record of this type of behavior***, and hope that in the future you do not dismiss such actions for the sake of other women at PRA.

(emphasis added).

**25.** Several hours after Woggerman noticed her resignation, PRA sent a company-wide email congratulating Justin Miller on a new promotion.

## COUNT I: SEXUAL HARASSMENT (TITLE VII)

**26.** Woggerman repeats and realleges the allegations in paragraphs 1 – 25 as if fully set forth herein.

**27.** Vice President Justin Miller's severe, sexually-charged conduct created an abusive and hostile work environment that altered the terms and conditions of Woggerman's employment.

**28.** Despite the fact that Woggerman was correctly skeptical of the legitimacy of PRA's complaint procedure, Woggerman attempted to take advantage of the "procedures" provided by PRA by filing a sexual harassment complaint against her harasser upon returning from the PRA business trip.

**29.** PRA failed to exercise reasonable care to prevent Miller's behavior in two regards: First, PRA, upon information and belief, had knowledge of Miller's propensity to sexually harass female subordinates through previous acts committed by Miller, but it failed to take corrective action against Miller in those instances reasonably designed to prevent future harassment; and second, PRA's so-called "complaint procedure" was merely cosmetic, at least to the extent the procedures are utilized against upper management, as the Company had no intention of taking corrective action against one of its vice presidents upon receiving Woggerman's sexual harassment complaint, even though the vice president admitted to sexually assaulting the complaining employee.

**30.** PRA failed to take any corrective action against Miller in response to Woggerman's sexual harassment complaint. Instead of taking corrective action against Miller, PRA promoted him upon Woggerman's resignation from the Company.

**31.** Woggerman was emotionally harmed by the hostile and abusive behavior by Miller as well as PRA's failure to respond thereto.

**COUNT II: RETALIATION (TITLE VII)**

**32.** Woggerman repeats and realleges the allegations in paragraphs 1 – 31 as if fully set forth herein.

**33.** In February 2010, Woggerman initiated a sexual harassment complaint against a company vice president for his repeated sexual advances and his sexual assault of Woggerman on a business trip.

**34.** In retaliation for filing a sexual harassment complaint against the Vice President of Collections, the VP of HR falsely accused Woggerman of committing two crimes; accused Woggerman of filing a false complaint; accused Woggerman of initiating the Complaint for personal gain; threatened Woggerman with disciplinary action if she did not withdraw her Complaint; admonished Woggerman for "wasting my time"; and issued Woggerman a final written warning, despite the fact that Woggerman had received no prior disciplinary action during her previously bright tenure at the Company. As a consequence of Woggerman's sexual harassment complaint, she was removed from consideration for a substantial promotion specifically designed for her advancement, she "drastically affect[ed]" any chance of future promotion, and she was denied a merit raise for which she was qualified. These actions would dissuade a reasonable worker from making a charge of sexual harassment and therefore constitute unlawful retaliation under Title VII.

**35.** PRA's conduct was intentional, malicious, and conducted in callous disregard of the rights of Woggerman.

**36.** As a result of PRA's conduct, Woggerman has suffered and continues to suffer harm, including humiliation, embarrassment, and mental anguish.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A. Judgment against Defendant PRA for an amount equal to Woggerman's damages shown at trial, including compensation for mental anguish, distress, humiliation, and pain and suffering.

B. Award Woggerman punitive damages in an amount to be determined at trial for PRA's intentional discrimination and retaliation.

C. Award Woggerman such interest as is allowed by law.

D. Award Woggerman her reasonable attorneys' fees, expenses and costs.

E. Grant such other relief, legal or equitable, as the Court deems appropriate.

JURY TRIAL DEMANDED.

Respectfully submitted,

SARA WOGGERMAN

By: Reid H. Ervin
Of Counsel

Reid H. Ervin, Esq. (VSB 01197)
rervin@reidervin.com
Joshua L. Jewett, Esq. (VSB 76884)
jjewett@reidervin.com
Reid H. Ervin & Associates, P.C.
2400 Dominion Tower
999 Waterside Drive
Norfolk, Virginia 23510
Phone: (757) 624-9323
Fax: (757) 624-8414